STATE of Iowa, Plaintiff–Appellee,

v.

Ruben Rico DEASES, Defendant–Appellant.

No. 90–414.

Court of Appeals of Iowa.

June 25, 1991.

Kermit L. Dunahoo, Des Moines, for defendant-appellant.

Bonnie J. Campbell, Atty. Gen., Ann E. Brenden, Asst. Atty. Gen., Mary E. Richards, County Atty., and Michael Houchins, Asst. County Atty., for plaintiff-appellee.

Heard by OXBERGER, C.J., and SACKETT and HABHAB, JJ.

SACKETT, Judge.

Defendant, convicted of first degree murder, contends on appeal the charge should have been dismissed because the State failed to comply with the speedy trial requirements. He further contends if the charge is not dismissed, he should be granted a new trial because of the admission of certain prejudicial evidence. We affirm.

Defendant-appellant Ruben Deases was convicted of murdering Jennifer Ann Gardner, his older brother Eustaguio Deases's girlfriend. A second brother Edward allegedly assisted him in the murder which was witnessed by a third brother, fourteen-year-old Johnny Deases. Johnny testified at trial.

From the testimony at trial the jury could have found the following facts. The victim Jennifer lived with Eustaguio in Ames. Eustaguio dealt in drugs. During Memorial Day weekend of 1989, Johnny, Edward and Ruben were all visiting in Eustaguio's home. Eustaguio flew to Texas the morning of May 28, 1989.

Jennifer, Johnny, Edward, and defendant were left in the apartment in Ames. Edward and Jennifer argued. Each accused the other of living off Eustaguio. Jennifer made a racial insult toward the Deases family. She pulled a gun and pointed it at the three brothers. The argument subsided. She put the gun away and went into a bedroom. The three brothers decided they needed to get rid of her. Edward wanted to work with Eustaguio in drug dealing. Edward and Ruben decided Johnny should kill Jennifer because, as a juvenile, he would receive a less severe penalty. Ruben told Johnny to go up behind Jennifer and choke her to death. Johnny agreed, went into the bedroom but could not bring himself to do it.

When he told Ruben he would not, Ruben was angry. About fifteen minutes later, Jennifer came back to the living room and sat on the couch. Ruben went behind her and picked her up off the couch in a choke hold. He held her in midair about forty-five seconds as she kicked her legs and gasped for air. Johnny asked Ruben to let her go. Ruben said it was too late. Ruben put Jennifer on the floor. Her face was blue. Ruben and Edward dragged her in the bathroom. She had a bowel movement and regained consciousness. She pushed herself up off the floor. She tried to speak; blood was coming from her mouth. Ruben used his foot to prevent her from getting up. Edward got a belt and made a loop with the belt. He put the loop around Jennifer's neck while Ruben held her down with his foot. Edward tugged on the belt, his foot on Jennifer's head. After strangling Jennifer for a minute or so, Edward handed the belt to Ruben. Ruben then pulled on the belt himself.

The three brothers then gathered Jennifer's belongings and put them in trash bags. Edward and Ruben put the body in the shower and took off Jennifer's clothes. Johnny later observed Ruben having sex with the body. The next time Johnny saw the body was just before 11:00 p.m. on the night of the 28th. Jennifer's body was in the shower with hot water running on it.

Later all three brothers went to the home of Chris Cox and used cocaine. They asked Cox what to do with a dead body. They told him they had killed Jennifer. Ruben and Edward left Johnny until 2:30 p.m. the next day at another friend's. When Johnny was picked up he heard Edward tell the host he had cut Jennifer's head off. When Johnny asked if it were true, Ruben said it was. Then the three brothers returned to Eustaguio's apartment. Johnny was told Jennifer's body was in a black trash bag Johnny had observed.

Edward and Ruben were surprised to learn from a radio report that Jennifer's head had already been found. Edward was pleased because the radio reports indicated the body had been decapitated with a fine cut.

At about 6:00 p.m. that day Johnny's brothers told him they were going to put what was left of Jennifer's body in water. Edward got a large box from a friend, telling him he needed it for Jennifer's body because they had killed her. Later that evening, a witness heard a loud splash at Little Wall Lake. Several days later, Jennifer's beheaded body was found in Little Wall Lake.

After Ruben was apprehended, he was taken to a juvenile detention facility where he was heard making up rap songs. One was "she thought she was cool and I was a fool, and now she is dead and I'm ahead." Another, "I knew a girl named Jennifer Gardner. She was a dancer. She was going to mark my brother off, my brother did her in, and now I'm doing time." He also used words to the effect he had picked up the head and closed her eyes and said "sorry, bitch, but it had to be this way." Ruben was also overheard telling another of the students he had "helped kill this gal and helped behead her."

## I.

Ruben's first contention is the State failed to comply with speedy trial requirements and the case should be dismissed. Ruben was seventeen when the murder occurred. Consequently, he was under the jurisdiction of the juvenile court. He was arrested on June 1, 1989 for the murder. A petition was filed concerning Ruben in juvenile court. The State filed a motion to waive jurisdiction of Ruben to adult court. The motion was granted on June 19, 1989.

Edward, who was an adult, had earlier been charged by a county attorney's information. On June 19, the day Ruben was transferred to adult court, the county attorney moved for leave to amend Edward's trial information to add Ruben Deases as a defendant. The county attorney presented the judge with an amended and substituted information, adding Ruben's name as a co-defendant on Edward's trial information. The judge did not approve the amended information.

The county attorney then filed a motion for leave to amend. The motion was brief and contained an order on the same page which read:

NOW ON THIS 19 day of June, 1989, the Court does hereby ORDER the State of Iowa is granted leave to Amend the Trial Information in the above-captioned case by adding Ruben Deases as defendant in the trial information previously filed.

The judge signed this order. The order was filed in its entirety on June 19, 1989. No amendment to the trial information was filed. On June 28, 1989, Edward Deases filed a resistance to the June 19 order granting leave to amend his trial information to add Ruben as a defendant. Edward contended the June 19 motion to amend was not timely. On July 27, 1989, the trial court vacated the order of June 19, 1989 granting leave to amend. Ruben did not participate in this proceeding. A hearing on the motion to amend was set for July 31, 1989. The hearing did not take place. Meanwhile, on June 21, 1989, Ruben had filed a written arraignment which recited Ruben had received a copy of the trial information charging him with murder in the first degree in violation of section 707.-2(1) and that he was not charged by his true name, Ruben Deases.

On June 22, 1989, the county attorney filed another motion to amend the information to change the spelling from Rueben Deases to Ruben Deases. The trial court ordered the correction. On August 22, 1989, defendant moved to dismiss, claiming a speedy trial violation. On August 30, the defendant's motion was overruled. The State's motion to amend was granted. Finally on August 31, 1989, an actual amended information was filed naming Ruben and found by the trial judge to contain sufficient evidence to convict.

Ruben refused to plead to the amended information in a written response filed on September 5, 1989. The court arraigned Ruben and entered a not guilty plea on his behalf in an order on September 14. The order noted Ruben was presumed to have demanded a speedy trial unless he subsequently waived it. All deadlines for discovery, pretrial motions, and speedy trial were to commence from September 14.

Ruben filed a second motion to dismiss and a rule 179(b) motion on September 5, 1989. The rule 179(b) motion was granted on September 19, 1989, and the record was corrected to reflect that neither Ruben nor his attorneys had received a copy of an approved amended trial information until August 31. The second motion to dismiss was overruled on September 22, 1989.

Defendant contends the trial court erred in failing to grant a dismissal of the trial information because of lack of a speedy indictment. Defendant contends error was preserved, in that it was raised both before and after the trial information was filed. The State argues for a number of reasons error was not preserved. We reject the State's argument and address defendant's claim.

Ruben filed motions to dismiss on two separate grounds: (1) there was no trial information filed within forty-five days of his transfer from juvenile court, and (2) the State failed to refile an amended trial information within the mandatory twenty-day period under Iowa R.Crim.P. 10(6)(c) after

the order on July 27, 1989, vacating the order of June 19, 1989, granting leave to amend the trial information. The trial court found good cause for failure to promptly file the trial information. The trial judge also found the order vacating the June 19 order did not apply to Ruben. Ruben contends the trial information should have been dismissed because of lack of filing a speedy indictment.

■■■ It is the State's burden to show good cause for a delay in a speedy indictment. *See State v. Hunziker,* 311 N.W.2d 692, 694 (Iowa App.1981). Whether there is good cause depends on the reason for the delay. *Id.* The surrounding circumstances affect the strength of the reason for the delay. *Id.* If the delay has been short, and the defendant was not prejudiced by it, and the defendant has not demanded a speedy trial, a weaker reason will constitute good cause. *Id.* Nonetheless, if the reason for the delay is insufficient, these other factors will not avoid dismissal. *Id.* The arbitrary 45–day limit cannot be violated even "a little bit" without a showing of good cause. *State v. Sassman,* 226 N.W.2d 808, 809 (Iowa 1975).

The trial court found good cause for the delay in filing the trial information against this defendant. What will constitute good cause to excuse the late filing of a trial information depends upon the individual circumstances of each case. *Cf. State v. Goff,* 244 N.W.2d 579, 581 (Iowa 1976).

Cases discussing "good cause" in the context of speedy trial claims give us some guidance. *See State v. Finn,* 469 N.W.2d 692, 694 (Iowa 1991); *State v. Dickerson,* 313 N.W.2d 526, 528–29 (Iowa 1981); *State v. Hathaway,* 257 N.W.2d 735, 736 (Iowa 1977); *State v. Nelson,* 222 N.W.2d 445, 449 (Iowa 1974).

■■■ The speedy trial rules are for the protection of the rights of an accused by implementing constitutional guarantees of a speedy trial. *State v. Gebhart,* 257 Iowa 843, 847, 134 N.W.2d 906, 909 (1965). These rules, while meant to shield the defendant from unjust delays, are not intended to be a device by which, through technicalities, a defendant can obtain absolute immunity from prosecution. *See id.* The speedy indictment rule is not intended to be used to trap State officials. *See State v. Cennon,* 201 N.W.2d 715, 718 (Iowa 1972). Speed in trying the accused is not a separate consideration. The prime consideration is justice to the accused and the public. Speed is an attribute of justice. *See Pines v. District Court in and for Woodbury County,* 233 Iowa 1284, 1296, 10 N.W.2d 574, 581 (1943). The public policy of this State as set forth in Iowa R.Crim.P. 27(2) is to ensure criminal prosecutions be concluded at the earliest possible time. *Hunziker,* 311 N.W.2d at 694. This speedy indictment rule thus is broader than protecting an individual defendant's rights, thus not requiring prejudice to a defendant if the reason for delay was insufficient. *Id.* Even a short delay of one day, the lack of prejudice, and the lack of a demand for speedy indictment will not turn an insufficient reason for delay into a sufficient one. *Id.*

Provisions for the right to speedy trial in Iowa are provided in Iowa R.Crim.P. 27(2), which provides in applicable part:

It is the public policy of the state of Iowa that criminal prosecutions be concluded at the earliest possible time consistent with a fair trial to both parties. Applications for dismissals under this subsection may be made by the prosecuting attorney or the defendant or by the court on its own motion.

a. When an adult is arrested for the commission of a public offense, or, in the case of a child, when the juvenile court enters an order waiving jurisdiction pursuant to Iowa Code section 232.45, and an indictment is not found against him within forty-five days, the court must order the prosecution to be dismissed, unless good cause to the contrary is shown or the defendant waives his right thereto.

■■ The State first argues they did comply with the rule. The State argues they complied because the equivalent of a trial information was on file at all relevant times. The State contends the combination of Edward's trial information and the June 19 order granting leave to amend constitut-

ed a constructive trial information. The State has cited no authority to support this position, and we find none. There is another problem with the argument. The June 19 order was vacated by the trial court on July 27, 1989. While the trial court determined the order was not vacated as to Ruben, we are unable to determine the basis for this decision. The only trial information filed against Ruben was filed August 31, 1989. The trial information was not timely filed.

The only question we need address is whether a good cause was shown for the delay. Our review on this issue is to see whether the determination of the trial court is supported by substantial evidence in the record. *See State v. Dickerson*, 313 N.W.2d 526, 528–29 (Iowa 1981); *State v. Brandt*, 253 N.W.2d 253, 256 (Iowa 1977). The trial court found good cause for the delay in filing the trial information against this defendant.

It is not necessary that the delay be attributable to defendant in order for it to constitute good cause. *See State v. LaPlant*, 244 N.W.2d 240, 242 (Iowa 1976). Certain delays attributable to the State can constitute good cause. *State v. Ege*, 274 N.W.2d 350 (Iowa 1979) (State entitled to delay necessary to prepare on insanity issue, where defendant filed insanity notice on last day permitted for such motions); *State v. Albertsen*, 228 N.W.2d 94 (Iowa 1975) (delay caused by a pretrial appeal by the State sufficient to constitute good cause).

Delays attributable to the criminal justice system—including those occasioned by human disabilities and illness—have been found to constitute good cause for a speedy trial violation. *State v. Stanley*, 351 N.W.2d 539 (Iowa App.1984); *State v. Bond*, 340 N.W.2d 276, 279 (Iowa 1983); *State v. Newman*, 257 N.W.2d 29, 31 (Iowa 1977); *State v. Hathaway*, 257 N.W.2d 735, 736 (Iowa 1977); *State v. Thomas*, 222 N.W.2d 488, 492 (Iowa 1974); *State v. Jennings*, 195 N.W.2d 351, 356 (Iowa 1972) (non-chronic "court congestion" arising out of unique, non-recurring events which result in only a short delay may constitute

good cause), *contrast State v. Hines*, 225 N.W.2d 156 (Iowa 1975); *State v. Goff*, 244 N.W.2d 579 (Iowa 1976); *State v. Leonard*, 240 N.W.2d 690 (Iowa 1976); *State v. Wright*, 234 N.W.2d 99 (Iowa 1975); *State v. Sassman*, 226 N.W.2d 808 (Iowa 1975).

Delay attributable to human error and misunderstandings also have been found to constitute good cause. In *State v. Petersen*, 288 N.W.2d 332 (Iowa 1980), a trial date within the speedy trial period was set. The defense attorney was scheduled to be in another trial on the same day, and requested the prosecutor's consent to a continuance. *Petersen* at 334. The prosecutor advised a written motion for continuance would be required. *Id.* Rather than filing a motion, defense counsel made arrangements to be present on the scheduled trial date. *Id.* Meanwhile, the prosecutor believed the case had been continued in accordance with the earlier conversation and was unable to try the case on that day, necessitating the rescheduling of the case on a date outside the speedy trial period. *Id.*

The supreme court found good cause for the delay, particularly in light of the surrounding circumstances that (1) the delay (14 days) was relatively short, (2) defendant did not demand a speedy trial, and (3) he was not prejudiced by the delay.

Under these circumstances we think there was good cause. The first trial date was passed on the basis of an honest misunderstanding of counsel. The prosecutor reasonably believed that the defendant's attorney wanted the case continued and was to file a motion for continuance.

The State contends good cause has been shown because the defendant actively contributed to an error which would have been discovered: (1) had he been truthful, or (2) even had he been silent where he was expected to speak (arraignment), after its occurrence. The State claims the defendant fostered the notion he was satisfied with the institution of this prosecution.

The State clearly dropped the ball. This was a horrendous crime. The State gathered and presented substantial and damn-

ing evidence of the defendant's guilt. But the State in filing a charge is bound by certain rules, duties and obligations. They are basically the same, no matter how minor or horrendous the crime. They are the same whether the evidence of the defendant's guilt is strong or weak. The rule for filing speedy indictments is very clear. The time frames are set out. It is the responsibility of the county attorney and those assistants he or she employs to assure procedures are followed in a timely fashion. We understand the pressures of a busy prosecutor's office, and yet, the pressures do not excuse inattentiveness to details in any case, but particularly in a case this significant.

■ A defense attorney has no duty to assist the county attorney in correcting his or her errors. A defense attorney walks a fine line. He or she must do all that he or she can within the law to assure the best result for his or her client. This may include seeking a dismissal because the county attorney has made a technical error.

■ This is an extremely close case. We find the trial court did not abuse its discretion. The trial court found defendant knowingly misstated he had received a copy of the trial information in his written arraignment filed June 21, 1989. This finding is binding on us if supported by substantial evidence. *State v. Dickerson*, 313 N.W.2d 526, 528–29 (Iowa 1981); *State v. Brandt*, 253 N.W.2d 253, 256 (Iowa 1977). Ruben makes several arguments as to why this finding is in error, but there is substantial evidence to support the finding. We affirm on this issue.

## II.

The defendant next contends the trial court erred in admitting evidence he had sex with Jennifer's dead body. Defendant made a pretrial motion in limine to preclude the testimony. The motion was overruled. The trial court's reasons for overruling the motion were (1) the evidence related to malice aforethought and motive, (2) the evidence could corroborate Johnny's testimony, and (3) the State was entitled to show the entire transaction.

The challenged testimony came in through Johnny, who said about twenty minutes after he left defendant in the bathroom cleaning blood off the wall, he went back to the bathroom and found the victim's nude body laying down with her legs on top of the defendant's shoulders. Defendant was having sex with the body. Johnny also testified when defendant was asked about the sex act with the body, he said she was real loose and it felt different.

After the testimony came in, the trial court advised the jury the fact defendant committed a sex act with the victim's body could not be considered as proof he was a bad person or has a disposition to commit a crime, but it was to be considered solely on the issue of intent, premeditation and malice aforethought. The defendant contends the evidence was improperly admitted because it was not relevant to the crime with which he was charged. He further contends if relevant, it should still be excluded because its probative value is outweighed by its prejudice.

Rule 404(b) reflects the view that evidence of other crimes or wrongful acts will be excluded unless the evidence falls within one of the recognized exceptions to the rule. *See State v. Barrett*, 401 N.W.2d 184, 187 (Iowa 1987); *State v. Emerson*, 375 N.W.2d 256, 260 (Iowa 1985). In applying rule 404 the primary task is to determine whether the challenged evidence is relevant and material to a legitimate issue other than a general propensity to commit wrongful acts. *Barrett*, 401 N.W.2d at 187; *Emerson*, 375 N.W.2d at 260; *State v. Gibb*, 303 N.W.2d 673, 682 (Iowa 1981); *State v. McDaniel*, 265 N.W.2d 917, 921 (Iowa 1978).

Questions of relevancy and materiality of evidence rests largely within the sound discretion of the trial court. *State v. Watts*, 244 N.W.2d 586, 589 (Iowa 1976). We find an abuse of discretion only if the complaining party can show the trial court's action was not reasonable. *See State v. Cott*, 283 N.W.2d 324, 329 (Iowa 1979); *State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982). The State argues the intercourse is close

enough in time to prove defendant's malice and ill will toward Jennifer.

We recognize there are a series of cases where the court has held prior relations between the victim and the defendant are relevant to the defendant's state of mind when the murder is committed. *See State v. Kellogg*, 263 N.W.2d 539, 542 (Iowa 1978); *State v. Cole*, 63 Iowa 695, 697, 17 N.W. 183, 184 (1883); *State v. Moelchen*, 53 Iowa 310, 314, 5 N.W. 186, 189 (1880). We have difficulty applying the rationale of these cases here. There is no evidence of any sexual conduct between defendant and Jennifer as a prerequisite to her murder. The State argues the evidence is relevant. It contends Ruben demonstrated contempt and hatred for Jennifer by copulating with her dead body, and this was evidence of his mindset when twenty-five minutes earlier he participated in her murder. We need not address this argument.

 We do accept the State's argument the evidence was admissible to show part of the circumstances surrounding the crime. Events and circumstances which immediately surround an offense may be shown even though they may incidentally show commission of another crime. *State v. Garren*, 220 N.W.2d 898, 900 (Iowa 1974). Such evidence is admissible when it is an inseparable part of the whole deed. *State v. Nowlin*, 244 N.W.2d 596, 600 (Iowa 1976). The State may show a continuous series of occurrences to complete the story of the crime even if other offenses come to light in doing so. *See State v. Walters*, 426 N.W.2d 136, 141 (Iowa 1988); *State v. Fryer*, 243 N.W.2d 1, 6 (Iowa 1976); *State v. Drake*, 219 N.W.2d 492, 494 (Iowa 1974).

 Defendant next argues the evidence is more prejudicial than probative. It is difficult to comprehend evidence more prejudicial than testimony defendant was observed having intercourse with Jennifer's dead body, her legs on his shoulders. Especially, when this testimony was coupled with his statement about the sexual encounter afterwards. The State argues the prejudicial effect was minimized by the verbal instruction given after its admission and a written instruction on the use of the evidence. This is a case where in most circumstances the prejudicial effect would probably remain after the instruction. *See State v. Newman*, 326 N.W.2d 788, 792 (Iowa 1982). However shocking the evidence was when viewed in the context of all the evidence in this trial, we do not find the trial court abused its discretion.

AFFIRMED.

OXBERGER, C.J., concurs.

HABHAB, J., separately concurs.

HABHAB, Judge (concurring).

I concur with the majority opinion. The majority considered each assignment of error submitted by the defendant. It found none of sufficient merit to warrant reversal. I agree with that result.

This was a dreadful, shocking, and tragic crime against humanity that is almost without parallel in this state. From the testimony of witnesses, the jury could find that the defendant went behind Jennifer, picked her up off the couch, and proceeded to choke her. As she was held in mid-air she kicked and gasped for breath. She regained consciousness on the floor, and with blood coming from her mouth, attempted to speak. Defendant used his foot to prevent her from rising. She was yet alive. The defendant's brother, Edward, then put a belt around her neck while the defendant held her with his foot. The strangulation was completed.

The defendant and his brother then took her clothes off and put her body in the shower. Later the defendant had sex with the dead body. Still later she was beheaded by Edward. Her body was abused and disposed of in the most ugly of manner.

The defendant was seventeen years of age when the murder occurred. The case was transferred to the adult court on June 19, 1989. The State was specifically and unequivocally granted permission by court order to amend the trial information of Edward Deases (who as an adult had been charged by trial information earlier) so as to include Ruben as a defendant. No

amendment was actually filed, but Ruben on June 21, 1989, filed a written arraignment where, before entering his written plea of not guilty, he stated *he had received a copy of the trial information charging him with murder in the first degree in violation of section 707.2(1).*

I believe these facts alone rise to the level of a showing of good cause. Moreover, there is no possible way the defendant could have been prejudiced, for the State and the defense counsel elected to proceed with arraignment just as though an amendment formalizing the order granted by the trial court had been filed. Like the majority, I would affirm.