# IN THE COURT OF APPEALS OF IOWA

No. 23-1043
Filed June 5, 2024

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**JULIUS DE VONTE BLAKELEY,**
　　Defendant-Appellant.
_____

　　Appeal from the Iowa District Court for Palo Alto County, Carl J. Peterson, Judge.

　　Julius De Vonte Blakeley appeals his convictions for domestic abuse assault and harassment. **AFFIRMED.**

　　Martha J. Lucey, State Appellate Defender, and Ashley Stewart (until withdrawal) and Maria Ruhtenberg, Assistant Appellate Defenders, for appellant.

　　Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant Attorney General, for appellee.

　　Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**CHICCHELLY, Judge.**

Julius De Vonte Blakeley appeals his convictions for one count of domestic abuse assault by strangulation causing bodily injury and two counts of first-degree harassment. He contends insufficient evidence supports the domestic abuse assault conviction and the State violated his constitutional right to speedy trial. Upon our review, we affirm his convictions.

## I.      *Background Facts and Proceedings.*

In late January 2023, Blakeley; his girlfriend, A.S.; and another friend, Casey Wilson, went out for a night of partying. The trio met up at a house party for a few drinks before going to Bad Manners Bar in Emmetsburg, Iowa. There, they met another couple, Brooke and Juan DeLeon, and the group had some more drinks and played pool.

At some point in the evening, A.S. told Brooke, "[Blakeley's] hit me a few times before. He doesn't do it a lot, but he has hit me, and I'm scared he's going to do it again." She asked Brooke not to say anything "[b]ecause it would have made him angry" and "I would have gotten hit over it."

While at the bar, Blakeley and another patron engaged in an argument. Brooke testified that "he was beyond drunk at that point" and "when you're ready to fight somebody your adrenaline just rushes, so he just ripped off his shirt because he was in the moment angry." A.S. gave him the t-shirt she was wearing underneath her sweatshirt for him to wear, and he ripped that one off, too. By this point, bar staff were asking Blakeley to leave, so Juan promised he'd "get a shirt back on him." Juan gave him his own plaid, button-down shirt, leaving him in just his undershirt. Blakeley similarly ripped it off, "sending buttons flying everywhere."

Bar staff then asked the entire group to leave. Juan and Brooke offered their house for the group to have a bonfire, and the group accepted. A.S. helped guide Blakeley out of the bar and into Wilson's car. Wilson followed Juan and Brooke's car and the caravan headed towards the DeLeons' home.

In their own vehicle, Brooke received a Snapchat alleging that Blakeley physically abused A.S. Juan became angry and pulled over on the side of the road, and Wilson pulled her vehicle over behind them. Wilson, Brooke, Juan, and Blakeley all exited the vehicles while A.S. stayed behind in Wilson's car. Juan retracted Blakeley's invitation to his home because "I don't allow men that hit women [to] come to my house." Juan and Blakeley started "tussling" and fought, with "a lot of yelling" back and forth. Eventually, the two disengaged and returned to their vehicles. Juan and Brooke drove off, leaving Wilson, Blakeley, and A.S. behind in Wilson's car.

Wilson testified that after being uninvited from the bonfire, "it was like [Blakeley] flipped a switch. The switch had just flipped, and he just started yelling at [A.S.]." While Wilson drove away, Blakeley told A.S. that she "ruined his life" and called her names. He grabbed A.S.'s head and "ripped a fistful of [her] hair out." He made A.S. remove his sweatpants she was wearing, telling her she was never going to wear them again because "[w]e're done." Wilson recalled that "before [she] even knew what had happened," Blakeley jumped out of the moving vehicle. Wilson pulled over and A.S. followed Blakeley out of the car, stating she "knew the signs" and that "[i]t was going to be bad for me." Wilson persuaded both of them to return to the vehicle, and Blakeley promised he wouldn't hit A.S. again.

After the trio reentered the car and Wilson had started driving again, Wilson heard A.S. sniffle in the backseat. Blakeley, sitting in the passenger seat, suddenly "lunged" back at A.S. to attack her. Wilson started to slow down the car, but Blakeley "looked [her] dead in [the] face and was like if you stop this car I will kill you." She also recalled, "I could hear him smacking [A.S.'s] head against my back window" and "I could hear him hit her, and then she would cry, and then it would get–like, I could hear the fist hitting harder and harder." He threatened to kill A.S., Wilson, and both of their kids. During this time, A.S. testified that Blakeley,

> bit my ring hand, he bit this side, the left side of my face, he bit my right cheek, he bit my right ear, he bit my right hip, and he choked[1] me, he kept punching me, he slammed my head into the window.

She remembered "reaching down and trying to grab his jaw, fucking pry him off" as he was biting her and compared it to similar incidents of abuse with Blakeley. When he became violent, A.S. described how Blakeley would squeeze her throat until the blood flow was cut off and she could feel the pressure building in her head.

When Blakeley noticed them turn onto another road, "he started screaming you're trying to take me to the police department" and began "choking" Wilson as she was driving, telling her to "stop playing these games." Wilson then drove Blakeley to his mother's house in Marathon, where his mother, Blakeley, and A.S. lived together. When they were around a block away from the house, Blakeley jumped out of the vehicle again. With him now out of the car, Wilson rushed A.S.

---

[1] We use the word "choked" because that is the language used by A.S. when reporting the violence. We note the correct terminology would be "strangle." *See* Mary Pat Gunderson, *Gender and the Language of Judicial Opinion Writing*, 21 Geo. J. Gender & L. 1, 10–11 (2019) (discussing how language matters and noting that describing acts as "choking" can minimize or mitigate).

to the hospital. A.S. received two stitches on her head, and her injuries were treated and photographed.

On January 31, 2023, the State charged Blakeley with: Count I, domestic abuse assault by strangulation causing bodily injury; and Counts II and III, first-degree harassment. Proceedings were delayed because neither Blakeley nor his counsel appeared for the scheduled arraignment. On February 23, Blakeley wrote a handwritten letter to the trial judge requesting a new attorney. His counsel also moved to withdraw mid-March, citing "a material and irreconcilable break down in the attorney client relationship." The court granted their requests, allowing his first attorney to withdraw and appointing Blakeley's second attorney.

At a pretrial hearing on March 31, Blakeley demanded his right to speedy trial. But on April 14, the State moved to exceed the ninety-day deadline when it discovered Blakeley's second attorney had to have a major medical procedure.[2] At a Zoom hearing on the motion, Blakeley's counsel testified that one week prior, she learned she had to have gallbladder surgery and the procedure was scheduled for the first day of trial. She also explained that while she tried to contact several attorneys and public defender offices in nearby counties, no one was available. Aside from the medical issues, the State introduced additional evidence from Blakeley's probation officer, who testified that Blakeley had already had two attorneys in this case and five attorneys in his parole-revocation proceedings. This left few if any court-appointed attorneys in the surrounding counties to take his case. At this point in the hearing, Blakeley became disruptive and belligerent.

---

[2] Because a defendant must be brought to trial within ninety days, Iowa R. Crim. P. 2.33(2)(b), Blakeley's speedy-trial deadline was May 1, 2023.

When he was muted, he voluntarily left the call and did not return. The hearing continued without Blakeley's presence.

The court granted the motion to exceed, finding good cause to extend the deadline. The trial judge noted the "exhaustive record of other counsel and either their unavailability at the last minute to represent the defendant or their prior representation of the defendant which did not end well." The next day, Blakeley, through his counsel, moved to continue the trial in accordance with the ruling. The court granted the motion and scheduled trial for the next available date, June 20.

By mid-May, Blakeley's second counsel moved to withdraw after Blakeley was forcibly removed from depositions because of "disruptive behavior." She similarly cited a breakdown in attorney-client communication and "a difference of opinion with Defendant about case strategy." After a hearing on the motion, the court granted the withdrawal. In the interest of judicial efficiency and due to the lack of available attorneys, the court appointed Blakeley's parole-revocation counsel to concurrently represent him on these charges.

Blakeley's third counsel moved to dismiss the charges on speedy-trial grounds. The court denied the motion as untimely, but also noted that the motion would similarly fail on the merits because there was good cause for the extension.

On June 13, the trial was held, earlier than the original date of June 20. After a three-day trial, the jury found Blakeley guilty as charged. He appeals, contending that insufficient evidence supported the domestic abuse assault and his convictions should be dismissed because his speedy-trial right was violated.

## II. Sufficiency of the Evidence.

Blakeley first argues that insufficient evidence supports his domestic-abuse conviction. We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). In our review, "we are highly deferential to the jury's verdict," viewing the evidence in the light most favorable to the State and upholding if "the verdict is supported by substantial evidence." *Id.*

At trial, the jury was instructed to find Blakeley guilty if the State proved all of the following:

1. On or about the 22nd day of January 2023, the defendant did an act which was meant to cause pain or injury or result in physical contact which was insulting or offensive or place [A.S.] in fear of immediate contact which would have been painful, injurious, insulting or offensive to [A.S.].
2. The defendant had the apparent ability to do the act.
3. The Defendant knowingly impeded the normal breathing of, or circulation of blood of [A.S.] by applying pressure to the throat or neck or by obstructing the nose or mouth of [A.S.].
4. The Defendant's act caused a bodily injury to [A.S.] as defined in [an earlier instruction].
5. The act occurred between household members who resided together at the time of the incident.

Blakeley only challenges the third and fifth elements, arguing the State failed to establish evidence of strangulation or that the couple cohabitated.

### A. Evidence of Obstruction of Blood or Air Flow.

While Blakeley does not contest that he strangled A.S., he contends that the State failed to prove "that her blood flow was impacted by the choking" because it did not provide direct evidence of the strangulation by medical personnel. But we do not distinguish between direct and circumstantial evidence. *See State v. Jones*, 967 N.W.2d 336, 341 (Iowa 2021) (noting "the legal distinction between

direct-evidence and circumstantial-evidence was overruled long ago"). Instead, the State provided circumstantial evidence of A.S.'s medical treatment and other photographs and exhibits of her injuries.

Blakeley also argues that the State failed to prove the third element because it relied on descriptions of earlier instances of abuse. For example, the State asked A.S. what generally happens when Blakeley strangles her:

> Q: How does he do it to you?
> A: He grabbed my esophagus.
> . . . .
> Q: What does he do then? Does he apply pressure to your esophagus?
> A: Yeah. He squeezed.
> Q: Does it also cut off blood flow to your head?
> A: Yes.
> Q: Can you feel the pressure building in your head?
> A: Yes.

When questioning a Palo Alto County Sheriff's Deputy, a similar exchange took place:

> A: [A.S.] reported that when [Blakeley] did it, he did it by the front portion of the esophagus and showed me just like this. And as it happened, he did it for a little while, and then when he pulled off he squeezed really hard as he was pulling his hand away from her neck.
> Q: Did you ask her if she was affected by that pressure on her esophagus?
> A: I did.
> Q: Was it only her esophagus, or did it involve the blood flow?
> A: It involved the blood flow.
> . . . .
> A: She said it was very hard to breathe during this time, she could not swallow, and she said that she could feel the pressure build up in her head, like the blood was not flowing properly.

When "we view the evidence in the light most favorable to the State," we "includ[e] all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Crawford*, 972 N.W.2d at 202

(quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)). Based on these testimonies, the jury could conclude that Blakely follows a consistent pattern during each incident. A.S.'s testimony in particular weaves in and out between past events and the night in question, until they are almost indistinguishable; Blakeley's actions stay largely the same throughout. The State also introduced photographs and testimonies from the treating medical providers that are consistent with her narrative. We allow the jury to make reasonable inferences, and in fact, we view the evidence in the State's favor for sufficiency-of-the-evidence claims. *See id.* Based on the record, we find substantial evidence supports the jury's verdict.

*B. Evidence of Cohabitation.*

Blakeley similarly argues that the State failed to prove that he and A.S. cohabitated.[3] Despite A.S.'s testimony that the two resided together in his mother's house, Blakeley claims that this lacks sufficient detail and does not prove that they lived together "*at the time of the assault.*" Iowa Code §§ 236.2(2)(a) (2023) (emphasis added).

Upon our review, it is clear to us that A.S. and Blakeley were living together during the events in question. When the State questioned A.S. about her living arrangement, it asked her if she lived with him at his mother's house for approximately six months. She answered, "Yes." The State further confirmed the address and offered a photograph of the home, and Blakeley's mother verified that

---

[3] The State charged Blakely under Iowa Code sections 708.2A(1) and 708.2A(5), which incorporate "domestic abuse as defined in section 236.2, subsection 2, paragraph 'a', 'b', 'c', or 'd.'" Iowa Code § 708.2A(1). In turn, Iowa Code section 236.2(2)(a) defines domestic abuse to include assault occurring "between family or household members who resided together at the time of the assault."

her house was on the same street. His mother further testified that the couple lived there together and shared a vehicle.[4] After the events leading to his arrest, Blakeley was served an arrest warrant at the same address. Shortly after, A.S. moved her belongings out of the house. While the State did not ask A.S. to give the exact dates she moved in and out of the residence, the jury could reasonably infer that based on the timeline and testimonies, A.S. moved in approximately six months before the assault, had a fight with Blakeley that ultimately led to his arrest, and then moved out of the residence. Upon our review, we find the record supports that A.S. and Blakeley lived together at the time of the assault and therefore the conviction is supported by substantial evidence.

### III. *Alleged Speedy-Trial Violation.*

Next, Blakeley alleges his statutory right to speedy trial was violated because the State did not meet its burden in establishing good cause for the delay.[5] A defendant must be brought to trial within ninety days from the filing of trial information. Iowa R. Crim. P. 2.33(2)(b). If trial does not start before the ninety-day deadline, the charge must be dismissed "unless the State proves (1) defendant's waiver of speedy trial, (2) delay attributable to the defendant, *or* (3) 'good cause' for the delay." *State v. Taylor*, 881 N.W.2d 72, 76 (Iowa 2016)

---

[4] The parties also dispute the mother's testimony, arguing whether her use of "home" proves the couple lived there on the day of the assault. Because there are other, more probative testimonies, we do not consider whether the language usage is sufficient evidence by itself.

[5] Blakeley claims the State is arguing he did not preserve this claim. But we interpret the State's brief as implying that Blakeley *waived* his argument because he failed to cite authority. *See* Iowa R. App. P. 6.903(2)(a)(8)(3). We do not find Blakeley's speedy-trial argument either waived or unpreserved, so we consider its merits.

(emphasis added) (citation omitted). The district court concluded that good cause existed to extend the trial deadline, and we review such determinations for an abuse of discretion. *See id.* We will only reverse "if no reasonable basis in the record supports the trial court's finding." *State v. Castillo-Alvarez*, No. 08-0868, 2009 WL 2960419, at *1 (Iowa Ct. App. Sept. 2, 2009).

We first consider whether Blakeley waived his speedy-trial right. Throughout the proceedings, Blakeley consistently asserted this right. But through his counsel, he also moved to continue the trial beyond the deadline for health reasons. Iowa courts have previously acknowledged defense counsel's ability to waive a defendant's right to speedy trial on their behalf. *See State v. LeFlore*, 308 N.W.2d 39, 41 (Iowa 1981); *State v. O'Connell*, 275 N.W.2d 197, 200 (Iowa 1979). To prevent his counsel from having this authority, Blakeley asks us to overrule this precedent and require a defendant to personally waive speedy trial. But "[w]e are not at liberty to overrule controlling supreme court precedent." *State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014). We therefore find that Blakeley waived his right under the current law by moving to continue the trial beyond the ninety-day deadline.[6]

Next, we consider whether the delay was attributable to Blakeley, and we conclude that it was. Throughout these proceedings and his parole-revocation case, Blakeley was represented by eight different attorneys. His counsel would withdraw, citing communication difficulties, which would prolong proceedings. This

---

[6] Our analysis could stop here, needing the State to only satisfy one of three methods to warrant the speedy-trial extension. *Taylor*, 881 N.W.2d at 76. However, we consider the other two exceptions because that is where the parties' arguments focus.

cycling of representation heavily depleted the already-shorthanded court appointments in rural counties. *See* Hannah Haksgaard, *Court-Appointment Compensation and Rural Access to Justice*, 14 U. St. Thomas J. L. & Pub. Pol'y 88, 102–09 (2020). Further, Blakeley fired attorneys and requested substitutes multiple times, with one being dismissed "basically at the time of the hearing" after "yelling" occurred between Blakeley and the attorney. This required continuing the hearing to a later date in order to give the substitute counsel time to acclimate to a new case. Blakeley has also been a source of conflict, engaging in "disruptive behavior" that led to his removal from depositions and "repeatedly interrupting the Court" during a pretrial hearing. We find that Blakeley's "own conduct was a substantial factor in the withdrawal of his . . . lawyer[s], necessitating yet another change in counsel and an additional period of time for new counsel to achieve familiarity with the case." *State v. Campbell*, 714 N.W.2d 622, 629 (Iowa 2006). This led to delays in proceedings, which are attributable to Blakeley's own actions.

Finally, we move to a good-cause determination. In its finding, the trial court concluded that good cause existed to extend the deadline, and we agree. Our good-cause analysis "focuses on only one factor: the reason for the delay." *State v. McNeal*, 897 N.W.2d 697, 704 (Iowa 2017) (citation omitted). But we also consider "the length of the delay, whether the defendant asserted his right to a speedy trial, and whether prejudice resulted from the delay." *Id.*

While there are factors that weigh against the finding, such as the considerable length of the delay, *see State v. Miller*, 637 N.W.2d 201, 205 (Iowa 2001) ("[M]ost, if not all, cases justifying reversal based on speedy-trial violations involve delays numbering weeks or months, not days."), and Blakeley's

demand for a speedy trial, *see id.*, the State established good cause. "Delays attributable to the criminal justice system—including those occasioned by human disabilities and illness—have been found to constitute good cause for a speedy trial violation." *State v. Deases*, 476 N.W.2d 91, 96 (Iowa Ct. App. 1991); *see also State v. Newman*, 257 N.W.2d 29, 31 (Iowa 1977) (finding good cause for delay when county attorney was unavailable due to his wife's health); *State v. Goff*, 244 N.W.2d 579, 582 (Iowa 1976) (finding good cause for delay when illness and leave left "only two judges to serve 'eight different courthouses each week'"). The court ran into the unfortunate situation where the delay became "a matter of practical necessity." *Castillo-Alvarez*, 2009 WL 2960419, at *2. To no avail, the parties made efforts to locate substitute counsel, including contacting other public defender offices in nearby counties. *Cf. State v. Bond*, 340 N.W.2d 276, 280 (Iowa 1983) (considering "[e]fforts to locate another judge" in good-cause analysis). While we note that "general docket congestion" and failure to sufficiently staff do not establish good cause, these are "circumstances arising out of unique, non-recurring events which create a particular scheduling problem." *Id.* at 279. Blakeley's counsel could not attend due to a major medical procedure, and he could not be without counsel; this left the court in the precarious dilemma of choosing between a delay or leaving him without representation. The court ultimately scheduled trial for the next available date, but it was able to hold the trial even sooner albeit at still a considerable delay. We find no abuse of discretion in the court's decision.

Based on our review, we find that the State established its burden to warrant the deadline extension and therefore Blakeley's speedy-trial right was not violated.

*IV.* **Disposition.**

Because we find sufficient evidence supports the domestic abuse assault conviction and we further find that his speedy-trial right was not violated, we affirm Blakeley's convictions.

**AFFIRMED.**